UNITED STATES of America, Appellee,

v.

**Joseph GOLDMAN, Defendant, Appellant.**

No. 77–1227.

United States Court of Appeals, First Circuit.

Argued Sept. 8, 1977.

Decided Oct. 14, 1977.

Nathan Lewin, Washington, D. C., with whom Jamie S. Gorelick and Miller, Cassi-dy, Larroca & Lewin, Washington, D. C., were on brief, for defendant, appellant.

William A. Dimitri, Jr., Asst. U. S. Atty., Providence, R. I., with whom Lincoln C. Almond, U. S. Atty., Providence, R. I., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, and WOLLENBERG, District Judge.*

COFFIN, Chief Judge.

Defendant Goldman appeals his conviction on one count of transporting in interstate commerce a falsely made and forged check. 18 U.S.C. § 2314. Goldman cashed an $8,000 check in Providence, Rhode Island. The check was made out to Goldman and drawn on a Canadian bank account containing three dollars in the name of Max Lurner. The government presented testimony that Goldman was in fact the individual who had opened the account as Lurner and that the defendant had four blank checks on that account in his pocket when he was arrested. The defendant put on no defense at trial.

We will address ourselves only to the three issues that, as the defendant himself recognized, are the most compelling: (1) whether defendant's decision not to answer certain questions during an interview while he was in the custody of the FBI was an exercise of his Fifth Amendment right not to incriminate himself; (2) whether the prosecutor's remarks concerning the defendant's religion were so prejudicial as to require reversal; and (3) whether the prosecutor commented improperly on the defendant's decision not to take the stand in his own defense.

I.

Agent Burleigh of the FBI arrested the defendant on November 10, 1975. After the arrest and before interrogation Burleigh read the defendant his *Miranda* rights and then gave the defendant a standard

* Of the Northern District of California, sitting by designation.

FBI "Waiver of Rights" form.[1] The defendant signed this form and, answering Agent Burleigh's questions, gave an exculpatory story, the core of which was that the signature on the check was not forged, but rather was the genuine signature of a business associate, Max Lurner, who had opened the account in Canada.

The defendant objects to the use during the prosecution's case-in-chief and summation of two questions asked by Agent Burleigh during the interrogation to which the defendant either refused to respond or did not respond.[2] Defendant suggests that when he did not answer the questions relating to the location of Mr. Lurner's cousins and his possession of the blank checks he was exercising his right to remain silent. If that were so, it is clear that the prosecution would not be entitled to introduce evidence of that silence at trial or to comment on it during summation. *See Miranda v. United States*, 384 U.S. 436, 468 n.37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Chapman*

*v. United States*, 547 F.2d 1240, 1249 (5th Cir. 1977).

██ Here, however, as in *Vitali v. United States*, 383 F.2d 121 (1st Cir. 1967), the defendant did not stand on his rights. After hearing the *Miranda* warnings, he chose to make an exculpatory statement, and he answered most of the agent's questions probing that statement. We find that these facts meet the high standards of proof of waiver that *Miranda, supra*, 384 U.S. at 475, 86 S.Ct. 1602, sets out.

"A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to. This was not a case where the government commented upon . . . a prior exercise of rights. The government asked the jury to measure what the defendant said when he had no rights because he had voluntarily waived them." *Vitali, supra*, 383 F.2d at 123.[3]

1. The form reads in substance as follows:
   "YOUR RIGHTS
   Before we ask you any questions, you must understand your rights.
   You have the right to remain silent.
   Anything you say can be used against you in court.
   You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
   If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
   If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
   WAIVER OF RIGHTS
   I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
                              Signed_____"

2. The exact form of the questions and answers and the sequence of the interview are, unfortunately, not entirely clear from the record because Burleigh's testimony on voir dire and before the jury is not entirely consistent. On voir dire he stated:

"I remarked that it was surprising that he had four other checks in his possession. I asked him where he got them. Again he said Max Lurner had given them to him. I said, 'why would he give you checks especially in blank, what was the relationship between you and Lurner?' He went on to say that Lurner had put up the money for Mr. Goldman to play the commodities market and that the two of them were going to split the profits 70–30. . . . [H]e said that he had just come back from Israel where he talked to, I believe he got in contact with Lurner's cousin in Jerusalem, thereafter contacted Lurner but he was going to come back and straighten the whole thing out. I asked him where in Jerusalem I could find Lurner's relatives and what were their names and he was unable to reply."
Before the jury Burleigh testified, "I asked him, 'Well, how about the name and address of the cousins?' He refused to answer." Later, still before the jury, the following exchange occurred between the prosecutor and Burleigh:
"Q. You inquired about those checks of Mr. Goldman, am I correct?
A. Yes, I did.
Q. What did he tell you?
A. Nothing, he didn't respond."

3. So holding, we need not address defendant's argument, novel to us, that waiver cannot be predicated on the signing of the "Waiver of Rights" form. He contends that, given the

Defendant further argues that even if he did waive his rights initially he was entitled to reassert those rights at any time. The FBI form had advised him that he could stop answering questions at any time. *Miranda* clearly gives a suspect under interrogation the right to "[indicate] in any manner, at any time prior to *or during* questioning, that he wishes to remain silent." 384 U.S. at 473–74, 86 S.Ct. at 1627, (emphasis added). We can find no passage in the record, however, where Goldman did indicate that he wished to reassert his right to remain silent. The consistent indication, to the contrary, is that he wished to give his interrogator a complete exculpatory story. We find on the basis of the record that he thought he did answer the question about the checks[4] and that his decision not to answer the question about Lurner's Israeli cousins was simply a strategic choice, perhaps based on a fear that any answer might weaken the story.[5] Based on this finding we need not decide what would constitute a sufficient indication of a wish to remain silent, nor need we decide whether the Fifth Amendment gives a suspect the right to answer questions selectively. Because the defendant waived his rights and made a statement, the prosecutor was entitled to introduce that statement at trial and comment on it during summation.

Finally, the defendant argues that choosing not to respond to questions during interrogation, quite apart from constitutional privilege, has no probative value because the silence is ambiguous and may be prejudicial. *See United States v. Hale*, 422 U.S. 171, 176, 180, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). This case, however, is not controlled by *Hale*. Goldman did not remain silent. What he said provided a context that enhanced the probative value of his silent response to a particular question. Moreover, the jury knows that Goldman was not silent at the time of his arrest, dispelling the particular prejudice feared by the Supreme Court—that the jury would draw a "strong negative inference . . from the fact that the defendant remained silent at the time of his arrest." *Id.* at 180, 95 S.Ct. at 21.38. We are satisfied that admitting this evidence was not an abuse of discretion.

II.

Defendant next complains about the following statement by the prosecutor during summation:

"This defendant sits before you and you have the right to observe him and you consider in your deliberations his presence in the courtroom. He sits before you with what they call in the Jewish religion a yamaka [sic]. I think I asked you when you were selected to appear on this jury whether you would be prejudiced one way or the other because the defendant appeared to be of the Jewish faith. I would hope certainly that wouldn't be true under any circumstances. Why do I mention this? Why do I mention that—because based upon the facts of this case that religious symbol that this man wears has been defamed, defiled and scandalized."

The prosecutor showed extremely poor judgment. Defendant's religion had no bearing whatsoever on any legitimate issue in the case. Whether or not the statement was prejudicial, it clearly invited the jury to consider religion as somehow relevant.

---

pressures of a custodial interrogation, the fact that a suspect cannot acknowledge his understanding of his rights without also agreeing to waive them infects the signing with ambiguity, making it less than clear that there was a voluntary and knowing waiver. The FBI might well give thought to restructuring its form to avoid this kind of objection.

4. See note 2, *supra*. Defendant explained the checks by alluding to his business deal with Lurner, an explanation suggested, to be sure, by Burleigh's question. This does not mean that Agent Burleigh's testimony before the jury was necessarily inaccurate. It remained true that the defendant had not directly explained why he had the checks.

5. Because we find that the failure to answer was not a reassertion of rights, we attach no significance to the fact that one or the other of these questions may have been the last question in the interrogation.

Prosecutorial zeal cannot excuse such grave misconduct.

Nonetheless, we are loath to apply a rule that such a reference to religion necessarily requires reversal. At the close of the prosecutor's argument the judge told the jury, "[Y]ou find the facts from the evidence in this case and you do so without passion, without prejudice, objectively. A man's religion or a man's attire has no bearing to the case. It must not enter into your deliberations." He made a similar statement during his general instructions after the close of the defense argument. We hold that the trial judge, by his prompt and definite instruction, cured the prosecutor's error. *Cf. Taglianetti v. United States*, 398 F.2d 558, 566 (1st Cir. 1968) ("highly improper" argument by criminal prosecutor cured by prompt instruction to disregard the argument and decide the case on the evidence alone); *aff'd*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969).

### III.

■ Also in his closing argument the prosecutor said,

> "That stands uncontested because in cross examination by defendant's counsel there was no question about that, no question as to the checks were found on his person. That stands uncontradicted based on the cross examination of the testimony."

This statement comes perilously close to running afoul of the rule we stated in *United States v. Flannery*, 451 F.2d 880, 881 (1st Cir. 1971), making use by the prosecutor during closing argument of such words as "uncontradicted" prejudicial as a matter of law "when it is apparent on the record that there was no one other than himself whom the defendant could have called to contradict the testimony." Again, we cannot see why the prosecutor chose to hand the defendant an issue on which to appeal.

Having considered the prosecutor's summation, however, we have decided that it does not require reversal. The prosecutor may focus on the absence of impeachment during cross-examination so long as his comments are "sufficiently circumscribed and [do] not necessarily implicate appellant's assertion of his fifth amendment right" not to take the stand in his own defense. *United States v. Hooker*, 541 F.2d 300, 307 (1st Cir. 1976). We might construe the prosecutor's words to refer to the absence of a defense witness to contradict the government's case. This would be a serious problem since the defendant himself might be the most natural witness. But the prosecutor did add phrases limiting his remarks to cross-examination, and the judge promptly instructed the jury that it was to decide whether or not particular testimony stood uncontradicted. Later he instructed that the entire burden rests on the government, that the defense has a right to present no evidence, and that the closing arguments are not evidence. For these reasons we conclude that the defendant was not denied a fair trial. *See id. See also Lussier v. Gunter*, 552 F.2d 385 (1st Cir. 1977).

*Affirmed.*