Pamela S. BARTLEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2012–SC–000219–DG.

Supreme Court of Kentucky.

Oct. 23, 2014.

W. Robert Lotz, Jr., Covington, KY, for appellant.

Jack Conway, Attorney General, John Paul Varo, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, for appellee.

Opinion of the Court by Justice
NOBLE.

Appellant, Pamela Bartley, was convicted in Rowan Circuit Court of second-degree manslaughter for killing her husband,

Carl Bartley, and was sentenced to eight years' imprisonment. The Court of Appeals affirmed her conviction and sentence, holding that the trial court had not erred by admitting into evidence a recorded conversation between Appellant and a police detective in which Appellant repeatedly was silent in the face of accusatory questions, and that other errors in the case did not require reversal.

On discretionary review, the primary issue presented to this Court is whether the trial court erred by permitting the introduction of the recorded conversation into evidence, and whether the Commonwealth may introduce a criminal defendant's pre-arrest, post-*Miranda* silence as substantive evidence in its case-in-chief. In addressing this issue, we must necessarily address whether a criminal defendant may selectively invoke his or her right to remain silent, and if so, under what circumstances will continued comment from an accused constitute a waiver of a selective invocation of silence.

## I. Background

On July 31, 2007, police officers were dispatched to the residence of Pamela and Carl Bartley in Montgomery County. The dispatch was made in response to a call by some of Carl's relatives after they became concerned about his safety and whereabouts. Carl had failed to show up to a scheduled meeting with his sister the previous evening and had not responded to any attempts to contact him. Family members were especially concerned about Carl because of recent difficulties in his marriage. At the time of his death, Carl and his wife, Appellant, had been married thirty-eight years, but the relationship, which by many accounts had always been tumultuous, had grown even more volatile when Appellant learned that Carl had been having an affair for five years with a woman named Katherine Lee.

When officers arrived at the Bartley home, they were let inside with a key by members of Carl's family. Although an initial police sweep uncovered nothing out of the ordinary, Carl's relatives urged the officers to search the home again because Carl's vehicle was uncharacteristically parked inside the garage. A second sweep of the home revealed Carl's body—underneath some blankets and cardboard boxes—between two vehicles parked inside the garage. The cause of death was a single gunshot wound to the back of the head. Later analysis could not determine Carl's time of death, but ballistics analysis determined that the fatal shot had been fired by either a .357 or .38 handgun.

After Carl's body was found, Kentucky State Police Detective Larry Bowling was assigned as the lead investigator in the case. At the time he arrived on the scene, several of Carl's family members were present and stated they believed Appellant was responsible for Carl's death. Appellant was not at the scene because she had gone to visit her daughter the day before and had stayed the night. But Appellant had spoken to Carl's sister the night before when he had not shown up to meet her. During that conversation, Appellant indicated that she and Carl had had a heated argument that morning, that he had left, and that she had gone to visit her daughter, but that she was not concerned about his whereabouts because he was probably with his mistress. When Appellant did arrive at the crime scene after the body was found, she and her son separately advised Detective Bowling that she would not speak to him without an attorney.

Approximately a month after Carl's body was found, on September 7, 2009, Appellant called police to report that she

and her son had been chased and shot at as they drove in their vehicle and that the car's rear window had been busted out with a baseball bat by a man named Thomas Lee. Lee was Carl's mistress's brother. After reporting the crime to the responding officer, Appellant asked to speak to Detective Bowling.

After Detective Bowling arrived, he spoke with Appellant in his car parked in her driveway. The conversation, which lasted almost two hours, was recorded. It is this conversation that is the central focus of this appeal.

A brief synopsis of the conversation is relevant to the issues of this case. As played into the record at trial,[1] the conversation begins with Appellant consulting her attorney. She can be overheard acknowledging that she should only speak about the alleged incident of that day. Detective Bowling then read Appellant her *Miranda* rights and asked her if she wanted to talk to him. She indicated she did but only about the incidents of that day. Detective Bowling stated that he understood the limited scope of the conversation. Appellant proceeded to tell Detective Bowling a basic account of the alleged attack, but interwoven in this account, Appellant implicated Thomas Lee in the murder of her husband.

Appellant stated that she did not know why Thomas Lee wanted to kill her and her family like he had killed Carl. She further stated that Lee had broken into her and Carl's home many years before and that she wanted to reopen that case and see if any fingerprints could tie him to the murder. She inquired whether the police would test Lee's gun for gunshot residue and said that it was probably the gun he had used to kill her husband. In response to Appellant's assertions about Lee, Detective Bowling began to ask pointed questions about Appellant's involvement in her husband's murder.

Specifically, Detective Bowling focused his questions on the location of Appellant's .38 handgun, a gun she was widely known to carry in her purse, and what time she had left for her daughter's house the day before Carl's body was found. In response to questions about those subjects, Appellant would alternatively say nothing or would respond by saying she was not supposed to talk about that or that she had to do what her attorney had advised her to do.

The pattern of the nearly two-hour conversation was circuitous in nature. First, the detective would put forth his theory of the case (essentially, that Appellant had killed Carl because she was angry about his affair), and ask pointed questions about the location of her gun or her whereabouts the day before, which she would not answer or would comment that she should not answer. Inevitably, Appellant would then circle back to the crime she had reported that day and how she believed Thomas Lee was involved in her husband's death. Interspersed in this pattern, Detective Bowling and Appellant would casually discuss other topics, such as the couple's marriage or family.

Several months after this conversation, Appellant was indicted for murdering her husband. The Commonwealth indicated that it wished to introduce the entire audio recording into evidence during trial. Prior to trial, Appellant moved to suppress the

---

1.  A separate copy of the recording does not appear to have been included with the appellate record. Our review has been of the recording on the video record of the trial. It appears that this is the only way the recording was put into the record. Review of it has thus proved difficult to say the least, as the quality of the recording of a recording is very low.

audio recording on the grounds that she had clearly invoked her right to remain silent about instances other than the alleged September 7 incident and thus that Detective Bowling should not have questioned her about anything beyond the scope of the incident. Moreover, Appellant argued that the introduction of the tape would impermissibly allow the Commonwealth to comment on her right against self-incrimination under the Fifth Amendment to the United States Constitution and Section 11 of the Kentucky Constitution.

On the day the trial began, the trial court denied Appellant's motion and allowed the Commonwealth to introduce the recording in almost its entirety because it did not believe the conversation contained any damaging admissions by Appellant and that the reporting of the alleged incident was inextricably linked to Carl's murder. Appellant was ultimately convicted of second-degree manslaughter.

The Court of Appeals affirmed Appellant's conviction by a divided opinion. In affirming her conviction, the court found that though Appellant had invoked her right to remain silent as to events unconnected to the alleged incident on September 7, she had, by implicating Thomas Lee in the murder, impliedly waived her right to remain silent and thus the jury was entitled to hear the entire interview. Moreover, the Court of Appeals found that the other errors complained of in the case did not amount to palpable error.

Appellant sought discretionary review, which this Court granted.

## II. Analysis

**A. Admission of the recording violated Appellant's due process rights by using her silence against her.**

Appellant's main claim of error relates to her privilege against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Section Eleven of the Kentucky Constitution. Her basic argument is that the introduction of the recording was error because the tape was not relevant evidence and allowed the Commonwealth to impermissibly use her silence throughout the interview as substantive evidence against her. She also claims somewhat generically that the use of the evidence deprived her of a fair trial.

The privilege against self-incrimination has been recognized as being especially important in the context of police interrogations. In the seminal case *of Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court held that any person who is in custody and subjected to police interrogation must be informed of his right against self-incrimination, or as standard in *Miranda* warnings, his right to remain silent. *Id.* at 444–45, 86 S.Ct. 1602.

But the protections of the privilege with respect to incriminating statements are not automatic. An accused who "desires the protection of the privilege … must claim it," *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943), and must do so unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). The effect of invoking the right is that police questioning must cease. *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). If the police continue to press the issue, and the defendant makes incriminating statements, those statements are properly suppressed.

Closely related to an accused's invocation of the right to remain silent is wheth-

er, if at all, the government may use a defendant's silence in response to questioning. Prior to *Miranda,* the U.S. Supreme Court held that "the Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). And in *Miranda,* it reiterated that "[t]he prosecution may not ... use at trial the fact that [a defendant] *stood mute* or claimed his privilege in the face of accusation." *Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. 1602 (emphasis added).

Since *Miranda,* courts have grappled with various issues related to *Miranda* warnings and an accused's rights against self-incrimination, including the effect of giving the warnings themselves, whether and when an accused's silence may be used, and whether the accused waived the right. All of these issues are present in this case and must be addressed. Accordingly, the Court must make a number of determinations to address Appellant's claim of error. First, we must determine what effect, if any, the *Miranda* warnings given to Appellant by Detective Bowling at the beginning of their conversation had on the Commonwealth's ability to introduce her silence as substantive evidence against her at trial. Second, the Court must determine whether Appellant was entitled to selectively invoke her right to remain silent by remaining mute at various occasions throughout her interview. Third, and related to the second point, we must address whether she waived that right by making statements about her husband's death.

## 1. The giving of *Miranda* warnings generally render an accused's silence inadmissible.

As noted above, we must first address the impact of Appellant receiving *Miranda* warnings and what effect, if any, that had on the admissibility of her silence at trial. Both Appellant and the Commonwealth agree that Appellant was not technically entitled to receive *Miranda* warnings prior to her interview with Detective Bowling because she was not in custody. Indeed, the conversation, which was initiated at Appellant's request, took place in Bowling's police cruiser as it sat in the driveway of Appellant's home. Moreover, Appellant made references to getting out of the cruiser during the interview, so it was clear she felt that she could terminate the interview and leave at any time. Thus, the question becomes what effect, if any, do unnecessary *Miranda* warnings have on the admission of otherwise non-custodial silence as substantive evidence in the Commonwealth's case-in-chief.

The admissibility of a criminal defendant's silence has been discussed in predominantly two contexts: impeachment evidence and substantive evidence. As will become clear from the cases, the stage of the pre-trial proceedings—such as whether the accused has been taken into custody or has been given the *Miranda* warnings— plays a significant role in whether and how an accused's silence may be used.

The starting point of this analysis is the U.S. Supreme Court's decision in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which addressed the use of silence for impeachment purposes. In *Doyle,* two defendants were arrested and read their *Miranda* rights but neither made any statements to police. *Id.* at 611, 96 S.Ct. 2240. At the defendants' joint trial, each took the stand and stated for the first time that they were innocent and had been framed. *Id.* On cross-examination, the prosecution attempted to impeach each man's testimony by asking why, if he

was innocent, he had not told the same story when he was initially informed of his rights. *Id.* *Doyle* presented a post-arrest, post-*Miranda* warnings situation.

The Court noted that use of the defendants' silence as impeachment was improper because silence "may be nothing more than the arrestee's exercise of these *Miranda* rights," and is "insolubly ambiguous." *Id.* Moreover, the Court noted that *Miranda* warnings contain an implicit assurance that an accused's "silence will carry no penalty" and that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. 2240. This suggests that invocation of the right to silence is not necessary to protect silence, at least after having been given *Miranda* warnings.

After *Doyle,* the Court clarified under what circumstances silence may properly be used as impeachment. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court ruled that a defendant may be impeached by his pre-arrest, pre-*Miranda* warnings silence, noting that "no governmental action induced petitioner to remain silent before arrest," and that "[c]onsequently, the fundamental unfairness present in *Doyle* is not present in this case." *Id.* at 240, 100 S.Ct. 2124. Similarly, in *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court held that a defendant could be impeached by his post-arrest, *pre-Miranda* silence noting that "the record does not indicate that respondent Weir received any *Miranda* warnings during the period in which he remained silent immediately after his arrest," *id.* at 605, 102 S.Ct. 1309, and "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand," *id.*

The Court has also extended *Doyle* to circumstances involving the use of silence as *substantive* evidence of guilt. In *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the government sought to introduce evidence of the defendant's invocation of his post-arrest, post-*Miranda* right to remain silent as evidence of his sanity. *Id.* at 292, 106 S.Ct. 634. The Court held, relying on *Doyle,* that the introduction of this evidence was improper and noted that "[t]he point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." *Id.* at 292, 106 S.Ct. 634. Further, the Court noted that it was "equally unfair" to breach the implicit promises of *Miranda* and use a defendant's silence as affirmative evidence of his sanity. *Id.* The Court emphasized the effect of the *Miranda* warnings:

> In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized. In both situations, the State then seeks to make use of the defendant's exercise of those rights in obtaining his conviction. The implicit promise, the breach, and the consequent penalty are identical in both situations.

*Id.*

The U.S. Supreme Court more recently addressed the issue of silence as substantive evidence of guilt in *Salinas v. Texas,* —— U.S. ——, 133 S.Ct. 2174, 186 L.Ed.2d 376 (2013) (plurality opinion). In *Salinas,* the accused took part in a pre-custodial, pre-*Miranda*-warnings interview. He answered several questions but remained si-

lent when asked whether ballistics testing would show that a shotgun owned by him was linked to a recent murder. *Id.* at 2178. After a few moments of silence, the police asked additional questions, and the accused continued answering them. *Id.* At trial, prosecutors admitted the defendant's silence as substantive evidence of his guilt. *Id.* The plurality concluded that silence alone was not enough to invoke the protections of the Fifth Amendment, and, thus, the government's use of the defendant's silence was permissible because his silence was not under the auspices of his Fifth Amendment privilege. *Id.* at 2184.

But in reaching this decision, the plurality noted in a footnote, citing *Doyle* and *Jenkins,* that "Petitioner is correct that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings, but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him." *Id.* at 2182 n. 3. (citations omitted).

Considering this case law, this Court is tasked with determining whether pre-arrest, post-*Miranda*-warnings silence may be used at trial in the prosecution's case-in-chief. This exact factual circumstance has not been addressed by the U.S. Supreme Court. And the closest this Court has come is in cases addressing post-arrest, pre-*Miranda*-warnings situations.[2] See *Green v. Commonwealth,* 815 S.W.2d 398 (Ky.1991); *Hall v. Commonwealth,* 862 S.W.2d 321 (Ky.1993).

In *Green,* we held that the prosecutor committed error by suggesting guilt based on the defendant's silence when asked about ownership of a suspicious looking bag at the scene of his arrest. 815 S.W.2d at 399. We noted that "[t]he giving of a *Miranda* warning does not suddenly endow a defendant with a new constitutional right," and that "[t]he right to remain silent exists whether or not the warning has been or is ever given." *Id.* We also stated that "[t]he warning is required not to activate the right secured, but to enable citizens to knowingly exercise or waive it." *Id.* In *Hall,* we held that "[i]t is clear that the prosecution is prohibited from using the defendant's silence in its case-in-chief." 862 S.W.2d at 323 (citing *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)).

*Green* and *Hall* both address silence that comes after an arrest, and while both reiterate that the right to remain silent is not dependent on the giving of the *Miranda* warnings but rather pre-exists it, they are distinguishable from this case because an arrest had occurred in each prior to the silence. The Appellant here was not under arrest when she was interviewed and was silent in response to questions about the murder. Under *Salinas,* this silence could be used against her if she was not in custody and did not invoke her right to remain silent. However, she did verbally invoke her right to silence, and further the officer did recite the *Miranda* warnings. The relevant question with respect to Appellant, then, is whether invoking the right to silence and the giving of *Miranda* warnings makes use of her silence impermissible. First, we will address the effect of giving the *Miranda* warnings.

---

2. Shortly before *Salinas* was decided, we addressed a pre-arrest, pre-*Miranda* silence case, *see Baumia v. Commonwealth,* 402 S.W.3d 530 (Ky.2013), deciding the case on the basis of the lack of official compulsion and "reserv[ing] for another day whether a defendant's pre-arrest, pre-*Miranda* silence may be utilized in the Commonwealth's case-in-chief." *Id.* at 539 n. 12. *Salinas* has established that such silence can be used by the Commonwealth as not violative of the Fifth Amendment right to silence.

Other courts that have addressed factual circumstances similar to this one are split about the warnings' significance. In the context of impeachment, the Supreme Court of Maine held that pre-arrest, post-*Miranda* silence was admissible because the defendant "was not arrested or placed in custody, but stayed there as a matter of personal choice.... Thus the giving of *Miranda* warnings was an unnecessary police exercise taken out of an excess of caution." *State v. Robinson*, 496 A.2d 1067, 1071–72 (Me.1985). The court held that because the administration of *Miranda* warnings was unnecessary under the circumstances, the warnings' prophylactic function would not be served were the defendant's silence held inadmissible. *Id.*

The Supreme Court of Wisconsin reached a different conclusion in *State v. Fencl*, 109 Wis.2d 224, 325 N.W.2d 703 (1982). The court noted that "[t]he *Doyle* decision was based upon the fact that governmental action (i.e., giving the *Miranda* warning) encouraged or induced silence by assuring the defendant that such silence is protected," and thus "[r]eceipt of the *Miranda* warning is the important factor in the *Doyle* analysis, not whether the defendant has been arrested." *Id.* at 709–10. The Supreme Court of Connecticut has held likewise. *See State v. Plourde*, 208 Conn. 455, 545 A.2d 1071, 1077 (1988) ("The unfairness of using a defendant's silence following *Miranda* warnings is not mitigated by the absence of custody.").

We agree with the Supreme Courts of Wisconsin and Connecticut. While *Doyle* was technically an impeachment case, the proposition to be drawn from the case and

its progeny is that if a defendant is warned of his right against self-incrimination, and the defendant explicitly invokes that right, the government is estopped from using the defendant's silence against him as substantive evidence of guilt. Indeed, as noted above, the U.S. Supreme Court, in a case allowing substantive use of a defendant's pre-arrest, *pre-Miranda-warnings* silence, suggested in dicta that the giving of *Miranda* warnings changes the use-of-silence landscape of a case. *See Salinas*, 133 S.Ct. at 2182 n. 3. Again, the *Salinas* plurality stated "that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings," *id.*, but declined to apply that rule because the defendant "ha[d] not received the warnings' implicit promise that any silence will not be used against him," *id.*

■ In light of these cases, especially after *Salinas*, we believe that the giving of *Miranda* warnings generally bars the use of any ensuing silence. When an accused receives the *Miranda* warnings' implicit promise that any silence will. not be used against her, it is fundamentally unfair and a violation of due process to then use that silence against her.[3] We believe this is true even where the *Miranda* warnings are given unnecessarily. *Cf. Doyle*, 426 U.S. at 619 n. 9, 96 S.Ct. 2240 (discussing *Johnson v. United States*, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1943), in which the *erroneous* grant of a privilege "made it error for the trial court to permit comment upon the defendant's silence"). And while *Green v. Commonwealth* and *Hall v. Commonwealth*, discussed above, do not control the outcome in this case, the rule we

---

**3.** Appellant's argument has largely been that her right to silence under the Fifth and Fourteenth Amendments has been violated, whereas *Doyle* and cases relying on it have applied a more general due-process concern for fair-

ness. We nevertheless read her argument as encompassing this broader claim, as she complains about the fundamental fairness of her trial and relies on the Fourteenth Amendment.

announce fits with their reasoning, at least to the extent that they treat the police's official interference with an accused as the point at which the accused's silence may not be used against her, regardless of whether she has invoked her right to silence.

We must also note, however, that Appellant did, in fact, invoke her right to silence at the beginning of the interview. The Commonwealth admits that her invocation "was sufficient ... to invoke her right to remain silent with respect to all matters except the September 7th incident." We agree. *See Berghuis,* 130 S.Ct. at 2260 (requiring only a "simple, unambiguous statement[ ]" to invoke the right). That she had invoked her right further strengthens her claim that her due process rights were violated when the trial court allowed her silence to be used against her. In fact, her invocation of her rights likely brought her case under the rule in *Salinas,* presenting the opposite facts from that case and thus suggesting an opposite result. *But see Salinas,* 133 S.Ct. at 2184 (Thomas & Scalia, JJ., concurring in the judgment) (arguing that there is no constitutional violation absent compulsion, regardless of invocation). Of course, the Commonwealth argues that Appellant subsequently waived her rights after invoking, which we address below.

### 2. Selective silence is permissible and protected.

That Appellant was given her *Miranda* warnings is not the end of the analysis in this case, however, because she was not wholly silent in the face of police questioning. Instead, she was selectively silent, having agreed to speak with Detective Bowling about some matters and then remaining silent when asked questions touching on her possible involvement in her husband's murder. Thus, we must also determine whether Appellant's "selective silence" in response to questions about her husband's murder was permissible and, if so, whether the trial court erred by allowing the Commonwealth to introduce evidence of Appellant's selective silence at trial.

The issue of selective silence has never been directly addressed by the United States Supreme Court,[4] nor has it been addressed by this Court. The federal Courts of Appeals that have addressed the issue are split. The Commonwealth argues that the Court should adopt the rule announced by the Eighth Circuit in *United States v. Burns,* 276 F.3d 439 (8th Cir. 2002). In that case, the court found that evidence of the defendant's refusal to answer one specific question was admissible for multiple reasons, including the court's belief that the defendant's "silent response to one inquiry during the interrogation and eventual refusal to respond to further questioning were 'part of an otherwise admissible conversation' and that the admission of the conversation in its entirety did not violate his due process rights." *Id.* at 442.

The Commonwealth correctly notes that other Courts of Appeals have similarly rejected the notion of selective silence and held that it is not protected under the Fifth Amendment. *See, e.g., United States v. Pando Franco,* 503 F.3d 389, 396–97 (5th Cir.2007); *United States v. Goldman,* 563 F.2d 501, 503 (1st Cir.1977). In *Goldman,* the First Circuit reasoned that the Fifth Amendment does not protect selec-

---

4. *Salinas* involved an instance of selective silence, as the defendant had been answering questions, was silent in response to one question, and continued to answer other questions. The Court did not reach that issue, however, because it instead concluded that the defendant's right to silence had not been implicated because it had not been invoked.

tive silence because "[a] defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can later be referred to." *Id.* at 503. Other cases from other circuits have cited *Goldman* approvingly. *See United States v. Pitre,* 960 F.2d 1112, 1125–26 (2d Cir. 1992) (rejecting appellant's claim that the trial court erred by admitting evidence of his selective silence).

On the other hand, a number of other circuits have held that the government may not introduce evidence of a defendant's selective silence. For example, the Sixth Circuit has found that the introduction of silence, even "selective silence," violates an accused's rights under the Fifth Amendment. In *United States v. Williams,* 665 F.2d 107 (6th Cir.1981), the government elicited testimony from an FBI agent who had interviewed the defendant. The agent specifically testified that the defendant, after receiving *Miranda* warnings, answered some of the agent's questions, but refused to answer others. *Id.* at 109. The defendant also took the stand, at which time the prosecution focused on his refusal to answer the agent's questions. *Id.* In holding that the testimony was impermissibly admitted, the Sixth Circuit noted that it was improper not only to elicit the testimony from the FBI agent, but also to cross-examine the defendant about his post-*Miranda* refusal to answer certain questions. *Id.* at 109–10.

The Sixth Circuit noted that *Miranda* protected the right not to answer specific questions. *Id.* at 109. Specifically, the court cited to footnote 37 in *Miranda, id.,* which speaks to this issue, albeit in dictum: "In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. *The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."* *Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. 1602 (emphasis added).

Other circuits have also held that selective silence is protected by the Fifth Amendment. *See, e.g., Hurd v. Terhune,* 619 F.3d 1080, 1087 (9th Cir.2010) (*"Miranda* does not apply only to specific subjects or crimes. It applies to every question investigators pose."); *United States v. Ghiz,* 491 F.2d 599, 600 (4th Cir.1974) ("[I]n declining to answer certain questions, a criminal accused invokes his fifth amendment privilege or in any other manner indicates he is relying on his understanding of the *Miranda* warning, evidence of his silence or of his refusal to answer specific questions is inadmissible.").

The Seventh Circuit's decisions, which have applied different rules to different situations, demonstrate the difficulty courts have with this issue. For example, in *United States v. Davenport,* 929 F.2d 1169 (7th Cir.1991), the court allowed the use of a defendant's selective silence in a pre-arrest, post-*Miranda* situation. But in *United States v. Jumper,* 497 F.3d 699 (7th Cir.2007), the court held in a post-arrest, post-*Miranda*-warnings situation that evidence of selective silence could not be introduced at trial. The court distinguished *Davenport* in a number of ways. First, it noted that *Davenport* involved a non-custodial interview and therefore "there was no implicit threat if [the defendants] kept mum." *Id.* at 705 (quoting *Davenport,* 929 F.2d at 1174). Second, the court noted that, unlike in *Jumper,* the defendant in *Davenport* had testified at trial and the court was concerned with his "attempt to exploit his right to silence as to specific questions at trial." *Id.*

■ While neither of these cases is binding on this Court, we find the rationale in *Jumper,* like in cases from the Fourth, Sixth, and Ninth Circuits, is preferable here, at least as it concerns post-*Miranda*-warnings situations. Like in *Jumper,* the Appellant did not testify at trial and there was no concern that she would use her silence to gain an advantage at trial. Indeed, it was the Commonwealth who sought to use the videotape against her over her objections. Second, while it is only in dicta, the Supreme Court in *Miranda* strongly suggested that the prohibition on using an accused's silence should apply to all situations where an accused remains mute in the face of police interrogations. *Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. 1602 ("The prosecution may not ... use at trial the fact that he stood mute or claimed his privilege in the face of accusation."). While that does not apply to pre-arrest, pre-*Miranda*-warnings (where the right to silence has not been invoked) situations after *Salinas,* it is nonetheless a strong statement that silence should not be used against an accused.

Finally, the Court notes that there is a strong policy reason for providing all citizens, including those under investigation for a criminal offense, the right to turn to police when they believe they are in danger without sacrificing their right to silence and inviting police to have another bite at the interrogation apple. Appellant called police to report that she had been shot at and that she was in fear for her life. There was no evidence elicited in this case showing that her story of being shot at was meritless. After consulting with her attorney, she indicated the scope of what she was willing to talk about and expressly stated that she only wished to discuss the events of September 7. Detective Bowling, however, seized the opportunity to interview Appellant about her involvement in Carl's murder, despite her numerous objections and pleas to Bowling to stay on topic.

If the Court were to decide that her silence, when asked questions about another incident for which she was being investigated, was admissible, we would greatly disincentivize criminal suspects from using police services in bona fide emergency situations. A decision to the contrary would chip away at the notion that a person is innocent until proven guilty, as we would be tacitly approving police taking advantage of potential emergencies to conduct interrogations about unrelated matters even where a suspect has unambiguously invoked and exercised her right to remain silent, albeit selectively.

### 3. Appellant did not waive her rights.

■ Though due process ordinarily bars the use of an accused's post-*Miranda*-warning selective silence, as discussed above, we must also address whether Appellant impliedly waived her right to remain silent by repeatedly mentioning matters other than the September 7 incident. The Court of Appeals held that although "Pamela had been informed of her *Miranda* rights, acknowledged she fully understood them, stated that she had contacted her attorney, and was invoking her right to remain silent as to events unconnected with the September 7, 2007, incident involving Thomas Lee," and that "throughout her conversation with Det. Bowling, Pamela attempted to manipulate the discussion to implicate Thomas as Carl's murderer." Further, she "willingly discussed matters beyond the September 7, 2007, incident" and "consistently attempted to state her beliefs and direct the investigation into Carl's death but refused to answer any questions relating to her possible involvement in the crime." This conduct, according to the Court of Ap-

peals, "constituted at minimum an implicit waiver of that asserted right. Clearly, Pamela was aware of her rights, acknowledged her understanding of those rights, and subsequently made statements directly contrary to that assertion."

Ordinarily, an "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins,* 560 U.S. 370, 382, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (quoting *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), second alteration in original); *see also Wise v. Commonwealth,* 422 S.W.3d 262, 270 (Ky.2013).

■ The waiver requirement ordinarily applies to statements made in the course of custodial interrogation after *Miranda* warnings have been given. This is because of the inherently coercive nature of custodial interrogation. *See Butler,* 441 U.S. at 374, 99 S.Ct. 1755 (noting that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely" (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602)). Given our treatment of pre-custody but post-*Miranda*-warning silence above, we conclude that the same waiver rule applies to instances of an accused's silence after being given the *Miranda* warnings. Thus, before an accused's post-*Miranda*-warnings silence may be used against her, the prosecution must establish that she waived her right to silence of which she was assured by the *Miranda* warnings and upon which she relied.

■ The waiver analysis "has two distinct dimensions." *Wise,* 422 S.W.3d at 270 (quoting *Berghuis,* 560 U.S. at 382, 130 S.Ct. 2250). First, the "waiver must be Voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Berghuis,* 560 U.S. at 382, 130 S.Ct. 2250). Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Berghuis,* 560 U.S. at 382–83, 130 S.Ct. 2250). A waiver may be given either expressly or impliedly. *Id.* at 271.

■ The giving of *Miranda* warnings and an uncoerced statement must also be accompanied by a showing that the "accused understood these rights." *Id.* (quoting *Berghuis,* 560 U.S. at 384, 130 S.Ct. 2250). However, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* (quoting *Berghuis,* 560 U.S. at 385, 130 S.Ct. 2250). This is how an accused impliedly waives her rights.

In *Wise,* the Court examined the *Miranda* rights and held that the defendant "act[ed] in a manner inconsistent with their exercise," *id.,* when she went forward with a polygraph examination after being read her rights, and thus the trial court could presume that she "made a deliberate choice to relinquish the protection those rights afford," *id.* The defendant in that case confessed during a post-polygraph interview to having killed her husband, and this Court held that she impliedly waived her *Miranda* rights and that her confession was, thus, admissible.

The Court believes that the circumstances in *Wise are* dissimilar to Appellant's case because we do not believe that

the Appellant sufficiently acted in a manner inconsistent with the exercise of her *Miranda* warnings. Thus it was inappropriate for the trial court to presume that she made a deliberate choice to relinquish the protection those rights afford. In order to hold as such, the Court must address in somewhat considerable depth the interrogation that occurred.

At the outset, the Court notes that the Court of Appeals was overly broad when describing the extent to which Appellant deviated from her assertion that she would only discuss the September 7 events. While it is unquestionable that Appellant did not stay perfectly within the scope of her selective invocation throughout the entire course of the two hour interrogation— she stated several times that she believed Thomas Lee killed her husband—we do not believe that simply because she deviated slightly from the scope of her original invocation that she implicitly waived her right to remain silent.

A review of the interrogation is necessary to demonstrate why Appellant did not implicitly waive her right to remain silent. At the beginning of the interrogation, after Appellant had called her attorney, she informed Detective Bowling that she would only discuss the September 7 events, and was read her *Miranda* rights. She then began speaking about what she had claimed happened earlier that evening. She indicated that she had recognized Thomas Lee as the person shooting at her and said she was terrified of him for "what he has already done." She further stated that the gun that Thomas Lee used was likely the gun that Thomas used to kill Carl, and asked if the police would test him for gunshot residue and the gun for fingerprints. She again asked whether they could get Thomas' gun to see if it was the weapon used in Carl's murder. At this point in the interrogation, it is evident that Appellant was indeed tangentially discussing Carl's murder to explain why she was scared of Thomas Lee and to see whether the police intended to investigate Thomas's gun. Their discussion then turned to whether Thomas Lee could· be tested for gunshot residue and whether his fingerprints could be tied to a burglary of Appellant's home years before. Appellant stated repeatedly that she was afraid for herself and her family. But the context remained clear that she was explaining why she was so frightened by the events that had just occurred.

Shortly after that, the detective stated he knew that she loved her husband, and that they had ups and downs. He then said, "There are a lot of questions I'd like to ask you. Only you can answer them." He then said it was her decision, not her attorney's or his decision, whether to answer questions. She replied by saying, "Ben [her attorney] told me no. [inaudible] So I shouldn't." The detective again told her that there were questions that only she could answer, and that it was her decision alone whether to answer them. She then tried to redirect the discussion, asking what she could do about the alleged shooting that day. They then discussed whether and how she could file charges.

Appellant then stated that she did not understand why Thomas Lee was after her, that she didn't know anything. She then cried for a few moments, saying things that are difficult to hear on the record. A moment later, she asked the detective whether he had seen her husband's body. The discussion then turned to Appellant's grandson for a few minutes. During this, he told her that he only wanted to ask her questions and that they were not hard questions.

At that point of the interrogation, Detective Bowling abandoned any discussion of the September 7 events and began focus-

ing his questions on Carl's murder and what may have led up to it. He began asking questions about Appellant's relationship with Carl, specifically Carl's infidelity, noting between questions that he only wanted to know the truth. Appellant indicated that she forgave Carl for his affair and that she never would have left him. Much of this discussion is difficult to hear, in part, because Appellant was crying.

A few minutes later, Detective Bowling then asked about Appellant going to her daughter Carla's house the night of the murder. Appellant was mute and did not answer. Their discussion continued, with Detective Bowling again saying multiple times that he knew that she loved her husband and discussing Carl's mistress, though much of the discussion is difficult to hear. A few minutes later, Detective Bowling again asked about Appellant going to Carla's house on Monday, noting that Carl was found dead the next day. Appellant stated, "I'm not supposed to talk about that." Detective Bowling acknowledged this, telling her that was her choice and no one else's. Again, Appellant did not respond. He then went on to discuss how he knew that Carl had been unfaithful, that it was wrong, and that he had no doubt that Appellant loved Carl.

Detective Bowling then began to get more persistent with questions about Carl's murder. He began laying out his theory of the murder, stating, "You know I know what happened.... You all been fighting a long time." A few minutes later, he also told her that she had every right in the world to be mad. He then told Appellant that he just needed to know what happened, to which Appellant remained mute. He then talked to her more about Carl's mistress and an incident in which she swore out a complaint about the woman over shots having been fired. She

answered some questions about this, noting that the shots may have been recorded on 911 and that she swore out the complaint.

A few minutes later, he then began questioning her about her .38 pistol, interspersed with other discussions about him knowing she loved Carl and other topics. He asked Appellant where her .38 pistol was. Appellant did not answer. A moment later, he told her that he knew about her and Carl pulling guns on each other in the past. And about a minute later, he asked again where the .38 was, noting that he knew she had it. Appellant did not answer. He asked for a third time where the .38 was, telling her, "Let's be honest with one another. Let's get this over with. Let's be honest with each other." Again, Appellant remained silent. A few minutes later, he asked her a fourth time, and again, she was silent. She then asked whether Thomas Lee had been arrested for what happened that night and asked who was in charge of the investigation.

Detective Bowling referred to the location of the .38 for a fifth time, saying he did not understand why she wouldn't answer his questions about the .38. Appellant appeared to answer "I don't know." The Commonwealth, defense counsel, and the trial court judge reviewed the tape in the judge's chamber prior to trial and discussed this particular instance. A review of their discussions indicated that it was the consensus that Appellant's statement "I don't know" was not about the location of the gun but about why she would not answer Detective Bowling's question.

Appellant again asked whether Thomas was in jail and stated that Thomas had shot at them and had shot Carl. A moment later, Detective Bowling asked for a sixth time about the .38. Appellant replied that she trusted the detective but that she had to do what her attorney said.

Detective Bowling mentioned that Appellant had not given him any statement whatsoever and that she was wasting his time. He again brought up the .38 and said that he has asked a simple question and indicated that every time he asked he was met with silence. He then stated that he believed Carl had been cheating on her and that Appellant had unintentionally shot Carl because she had pulled her gun on him before. He then said, "If you want to be honest with me, cooperate, I'll do the best I can. But if you don't want to talk to me, of if you want to lie to me, there ain't no use in me just sitting here wasting my time and yours." He also said, "I asked you where your .38 is at and you won't answer. . . . I asked a simple question." Through all this, Appellant remained mute.

We do not need to discuss the entire interview. It suffices to say that the questioning continued like this for some time. Detective Bowling would make a statement or ask about something related to the murder, usually about when Appellant went to her daughter's house or where her .38 was. Often, he would frame the question by stating that if his wife had been killed and he was asked the questions by a police officer, he would answer. Usually, Appellant would not respond, but at least one time, she told him, "I'm not going to talk to you," to which he said it was her decision. At several points, Appellant tried to redirect the discussion, saying at one point she wanted to "switch gears" and that Detective Bowling had nothing to do with investigating the shooting she had reported, and repeatedly saying she wanted to talk about Thomas Lee. Eventually, the detective was blunt and told her that she was a suspect in Carl's death and that she was not answering his simple questions.

In at least one more instance, near the end of the interview, Appellant said that she would discuss the investigation through her attorney. The detective quipped that her attorney had not told her what to say.

Finally, at the end of the interview, Detective Bowling told Appellant that he believed she had something do with the murder and arrested her.

Upon a careful review of the interrogation, the Court disagrees with the Court of Appeals' characterization of the interrogation as an attempt "to manipulate the discussion to implicate Thomas as Carl's murderer," that Detective Bowling was merely "ask[ing] questions about her statements," at which point she "became silent and refused to respond," and that "[t]his pattern of events was repeated numerous times throughout the interview." Appellant implicated Thomas in Carl's murder at the very beginning of the interrogation to explain why she was scared for her life in light of her belief that Thomas had also attacked her and her son that night. Appellant only willingly mentioned Carl's murder during a few other instances, including mentioning at one point that she did not know that his body had been wrapped in a comforter.

Importantly, Appellant never once mentioned a .38 pistol nor visiting Carla's house the night of Carl's murder. Detective Bowling, however, asked about those two things repeatedly throughout the almost two-hour interrogation. The Court of Appeals' characterization of Detective Bowling's questions as merely asking Appellant to elaborate on her statements is an oversimplification and does not reflect what actually occurred during the two-hour interrogation. Additionally, Appellant never responded once to any questions about the .38 or going to Carla's house, instead remaining silent or specifically stating that she would not discuss Carl's murder and wanted only to discuss

the events from that evening, or that her attorney had told her not to talk about that.

A careful review of the interrogation clearly demonstrates that Detective Bowling had no intention whatsoever to discuss the September 7 events and he asked no questions about those events after the first few minutes of the interrogation. It is likely that Detective Bowling did not believe Appellant's story of being shot at that evening and thought she was lying to implicate Thomas Lee. To the Court's knowledge, however, nothing was introduced in the record that indicated that Appellant was lying about the September 7 events, nor does it matter whether her story was true for purposes of deciding whether she waived her right to silence. Rather, Detective Bowling treated the interrogation as an opportunity to discuss solely Carl's murder. Appellant remained silent or re-invoked her right to remain silent repeatedly throughout the two-hour interrogation, and only a few instances tangentially referred to Carl's murder. We cannot say that Appellant implicitly waived her right to remain silent, and the entire two-hour interrogation was inadmissible both under *Miranda* and its progeny.

Put bluntly, a citizen who calls on the police for help after an attack, and repeatedly invokes her right to remain silent on other matters, cannot be held to have impliedly waived her right to silence when an officer repeatedly ignores her attempts to remain silent on other matters, even if that persistence may lead to a few incautious statements. This is not a game, where the craftiest and most persistent police interrogator wins. Justice loses when the spirit and intent of the *Miranda* warnings' protections are ignored to obtain a "gotcha" question that, standing alone, might imply waiver. Instead, the entirety of the questioning must be reviewed to determine whether the defendant knowingly waived an asserted right to silence.

As the U.S. Supreme Court noted in *Berghuis*, the Commonwealth carries "a heavy burden" of proving that a waiver occurred, judged by the standard set out in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), that waiver must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Berghuis*, 560 U.S. at 385, 130 S.Ct. 2250 (citing *Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019). This Court does not believe that the Commonwealth carried its heavy burden of showing that Appellant waived her *Miranda* rights. Appellant's conduct throughout the interrogation, whereby she only deviated slightly from her selective invocation of silence, while also repeatedly refusing to answer questions and stating that she could not discuss certain issues, does not rise to the level of acting in a manner inconsistent with the exercise of her *Miranda* rights such that the trial court could presume that she relinquished the protections those rights afford.

### 4. Admission of the recorded interview was thus error.

Thus, the Court hereby holds that the trial court erred by allowing the audiotape with its repeated instances of Appellant's silence in the face of accusations and her statements that her attorney told her not to talk about anything except the alleged crime by Thomas Lee she sought to report. The detective had read Appellant her *Miranda* rights, and she was entitled to rely on the promises implicit in those warnings. Moreover, she repeatedly invoked her right to remain silent. The Commonwealth's use of Appellant's silence against her violated her constitutional rights.

The admission of the tape was not harmless error because this Court is not convinced that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We must, therefore, reverse the decision of the Court of Appeals affirming the judgment, and remand the case to the Rowan Circuit Court for further proceedings in conformity with this opinion.

Despite the Court's reversal of Appellant's conviction, we must now turn our attention to the remaining issues on appeal because they are likely to recur upon retrial.

**B. Issues Likely to Occur on Retrial**

In addition to challenging the admission of the recording itself, Appellant also complains that the Commonwealth impermissibly elicited testimony about her silence from Detective Bowling, improperly referenced her silence during closing argument, and admitted evidence of handguns that were conclusively not used in the murder. Having held that the admission of the recording was in error and that her silence was protected by her right against self-incrimination under the Fifth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution, the Commonwealth should not have commented on Appellant's silence in its closing argument nor through its examination of Detective Bowling.

Moreover, the handguns found at the Bartley residence that were conclusively shown not to be the murder weapon were irrelevant to the murder. "However, weapons, which have no relation to the crime, are inadmissible." *Major v. Commonwealth*, 177 S.W.3d 700, 710 (Ky.2005). The Court of Appeals agreed, but found the evidence harmless under *Matthews v. Commonwealth*, 163 S.W.3d 11, 27, (Ky. 2005), which stated that an error is harmless if there is no substantial possibility of a different result. This was the wrong standard for evaluating harmless error, and has been supplanted by *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009), which focuses on whether the error affected the verdict. Regardless, the weapons should not be admitted on retrial unless they can be shown to be connected to the crime.

**III. Conclusion**

For the foregoing reasons, the judgment of the Court of Appeals is reversed, Appellant's conviction is reversed, and this case is remanded to the Rowan Circuit Court for further proceedings consistent with this Opinion.

All sitting. MINTON, C.J.; ABRAMSON, KELLER and VENTERS, JJ., concur. CUNNINGHAM, J., dissents by separate opinion in which SCOTT, J., joins.

CUNNINGHAM, J., dissenting:

I respectfully dissent.

Any error which may have been committed by the trial judge in admitting the taped conversation with Appellant was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The proof was overwhelming that Appellant and victim had a tumultuous relationship over the course of their long marriage. Appellant became more threatening toward the victim after finding out that he was involved in an affair. On one occasion, the victim called a member of the Kentucky State Police to come to the house over a domestic fight between the two. He even went to the Montgomery County Attorney's office to inquire about getting an emergency protective order

against Appellant. She constantly threatened to friends that she was going to kill him. She even threatened to kill the woman engaged in the affair with her husband.

On the weekend before the victim was killed, Appellant told her grandson Dalton, "I'm going to kill him." She even pulled a gun on the victim in front of their grandchild.

Appellant possessed a .38 caliber pistol which she brandished and fondly referred to as "her baby." The victim was killed by a bullet to the head which was fired from either a .38 or .357 caliber pistol. Significantly, her weapon was apparently never found after the shooting. On the day of the killing, Appellant withdrew $5,000.00 from a joint account which she shared with her husband, and left town.

What was significant about the taped interview of Appellant that was introduced into evidence? Not much. The trial judge conducted a very extensive, thoughtful, and reflective out of court hearing concerning the admissibility of the tape. It appears that the trial judge listened to the interview—which was over an hour long—twice.

About a month after the killing, Appellant requested Detective Larry Bowling to come to her house. She and Detective Bowling conducted the taped conversation in question in his car in her driveway. She complained that the brother of her late husband's lover shot at her and her son while they were traveling in her car. She also accused the man, whose name was Thomas Lee, of not only knocking out the back window of her car, but also as being the one who killed her husband.

As in most cases, the quality of this taped interview was not good and it is doubtful how much the jury was able to understand when the tape was played in open court or in the jury room during deliberations. Appellant did most of the talking and was very emotional. There was hardly any "silence" anywhere in the conversation. Although there was much crying and even screaming, the "interview" was largely conversational in tone, including much "give and take." The trial court correctly noted that the stories of Appellant's husband's murder and the alleged attack by Thomas Lee were so intertwined that it made redaction impossible.

It appears from the ragged recording, that prior to their discussion in the car, Bowling advised Appellant of her *Miranda* rights and that she called her lawyer in the detective's presence. Her lawyer told her to talk about the incident with Thomas Lee but not about the killing of her husband. As previously noted, there is very little, if any, silence on this tape. Therefore, Appellant's responses to Detective Bowling's questions about the murder are more accurately described as refusal to talk, not "silence." It is impossible for me to perceive the jury penalizing Appellant for following her attorney's advice in eluding the subject of her husband's murder. Her conviction was a result of the weight of the evidence presented by the Commonwealth, not the admission of the taped interview.

This was a murder case which ended in a second-degree manslaughter conviction. It covered several days of testimony. The majority reverses and sends back for a new trial on an error which played a very small and inconsequential role in the conviction. The Commonwealth presented overwhelming evidence of Appellant's guilt. *See Green v. Commonwealth,* 815 S.W.2d 398, 399–400 (Ky.1991) (holding that prosecutor's comments concerning defendant's silence as evidence of guilt was harmless in light of overwhelming evidence). Lastly, the trial judge in the present case literally took hours in wrestling

with this issue. Any error that may have resulted was certainly harmless beyond a reasonable doubt. Therefore, I would affirm.

SCOTT, J., joins.