# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: APRIL 24, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0281-MR

DILLON BREWSTER          APPELLANT

V.        ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
NO. 22-CR-00001

COMMONWEALTH OF KENTUCKY          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

After a jury trial, Dillon Brewster was convicted of murder, kidnapping, possession of a firearm by a convicted felon, and being a first-degree persistent felony offender (PFO-1). The Kenton Circuit Court sentenced him to life imprisonment.

Brewster admitted when he testified at trial, that he killed his live-in girlfriend Kameryn Recchia and drove away afterwards with Recchia's three-year-old son (child). Brewster appeals, arguing the trial court erred by: (1) refusing to instruct the jury on the defense of self-protection; (2) excluding testimony from the defense expert about the likely effects of the cocaine found in Recchia's blood on her behavior; (3) allowing the Commonwealth to use his post-arrest, post-*Miranda* silence—to questions that were never asked of him— against him; (4) not excluding gruesome photos from the crime scene and

autopsy; and (5) instructing the jury on kidnapping in such a manner as to deny him a unanimous verdict. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 19, 2021, Brewster killed Recchia at the home they shared, shooting her twice. Afterwards, he drove away in Recchia's vehicle with child while using Recchia's cell phone to navigate. Brewster was still armed with the .22 caliber rifle he had used to kill Recchia. The next day, the Ohio State Highway Patrol (OSHP) received a report of reckless driving in the southbound lanes of I-75, about eighty miles north of the Kentucky border. Trooper Christopher Roe activated his lights and sirens to pull Brewster over. Brewster did not stop and was pursued for several miles before spike strips were used to stop the vehicle.

Given that Brewster did not stop, Trooper Roe, Sargent Brent Johnson, and Trooper Eric Devers, treated the stop as a felony stop for felony fleeing and eluding. The officers approached the vehicle from multiple directions with their guns drawn. Brewster surrendered peacefully, exited the vehicle, and was arrested.

Trooper Roe's vehicle cameras recorded video and audio of the chase, stop, and Sargent Johnson's interview of Brewster when he was placed in the backseat of the vehicle. These videos were admitted into evidence and played at trial.

Sargent Johnson heard child crying when they first approached the stopped vehicle. Child was found in a car seat in the back seat of the vehicle.

2

When Trooper Roe first saw child, child did not appear to be scared, but had a full diaper. Trooper Roe, Trooper Devers, and other officers tried to comfort child and keep him calm.

The officers found a .22 caliber rifle on the backseat floorboard and separate from it found a magazine containing nine rounds of .22 caliber ammunition. The officers also found marijuana, .22 caliber ammunition, and a cell phone (later identified as belonging to Recchia) clipped to a bracket on the front dash. All the ammunition in the vehicle was later identified as being the same caliber and brand as that found at the crime scene.

Brewster was placed in the back of Trooper Roe's vehicle and Sargent Johnson read Brewster his *Miranda*[1] rights after which Brewster answered all of Sargent Johnson's questions. Brewster explained that his girlfriend Recchia owned the vehicle, the child was his girlfriend's child, and he was not related to child. Brewster stated that he thought Recchia was at his house and that she knew he had her vehicle and her child. Brewster was asked for Recchia's phone number. He explained he had her phone and then provided an alternative number for her. Video of their interaction was admitted at trial.

According to Trooper Roe, he talked to Brewster after he transported Brewster to the Piqua post. Brewster told Trooper Roe that he was returning from Toledo where he had gone to trade his truck for a welder and "some stuff."

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

When asked what he was doing while he was fleeing from the police, he said he was "talking to the baby."

After unsuccessfully trying to reach Recchia, dispatch in Ohio requested that the Kenton County Police go to the residence that Recchia was sharing with Brewster to notify her that her vehicle and child were in Ohio. Officer Adam Watson testified that on October 20, 2021, at about 8 p.m., he went to the residence, knocked on the door, and no one answered.

Later that evening, Recchia's mother, Lisa Recchia, learned from another daughter that child was in Ohio with Brewster, and no one knew where Recchia was. Lisa spoke to Officer Watson and explained to him that Recchia was deaf. This was new information to him.

Lisa and her husband, Kipp Hensley, met Officer Watson outside the residence at about 11 p.m. No one answered the door. Hensley climbed through an unlocked window and let the officers in through the front door.

Officers discovered Recchia's body in the kitchen. She had been shot two times in the head. A .22 caliber projectile was found lodged in the kitchen wall. Recchia's body had minor scrapes, abrasions, and scabbing on her knuckles.

Also found in the kitchen were two casings which were later linked to the rifle found in the Recchia's vehicle, and three unfired bullets.

The day after Brewster's arrest, Detective Nick Rhoden, another Kenton County officer, and a Commonwealth Attorney traveled to Ohio to interview Brewster. Detective Rhoden read Brewster his *Miranda* rights and Brewster signed a form consenting to the interview. Detective Rhoden was the only

4

person who questioned Brewster. He explained that he wanted to learn how Brewster came to be in Ohio with child. This interview was recorded and admitted into evidence at trial and played for the jury.

Brewster said he and child were coming from Toledo where they were looking for stuff to trade. They ate, went to a park, and were heading toward Detroit. He explained he decided to go home instead and was on his way home and tired when he was pulled over by the police. Brewster said he was raising child as his own and they all lived together, and his father had recently passed away.

Brewster told Detective Rhoden that Recchia knew he had child with him, and he had seen her before he left with child in the morning, and she knew they were going to Detroit. Brewster denied that anything unusual had been going on before he left his home with child.

Brewster reported that the previous night (October 19) he had sold a trailer to someone at his house. The police were able to verify that this sale took place, Brewster and Recchia were both present, and the sale occurred at around 7 or 8 p.m.

Brewster said the rifle was Recchia's and he took it from their home because they had been fighting and he was afraid she would call his parole officer and turn him in because he was a felon. When asked what they were arguing about, he said it was "normal stuff," and then explained that a lot of stuff happened at the "strip club" where she worked. After Detective Rhoden

5

confronted Brewster about the fact that Recchia was dead, and his belief that Recchia was not alive when Brewster left the residence, the interview ceased.

At trial, evidence was presented about what occurred in the days prior to Recchia being killed. Recchia made her living dancing at a club in Newport called The Playpen. She was working on the evening of October 18-19, 2021. The Commonwealth presented text message evidence that Brewster bought a bag of cocaine that night for the both of them, and kept most of it for himself, as he sent her a text message asking, "Are you sure I can just give it to you he only gave me one bad (sic) so I got to separate it?" and she later texted him "Yeeeesh mister. You did take a lot lol. But that's okay. Just don't lose your shit please and be good with [child]." She later texted him "Just try nooooot to do it all tonight. I want to sleep later and I want you to be nice and normal. You guys home yet?"

Brewster's brother had picked Brewster and child up from the club after Brewster brought Recchia the cocaine; Brewster left Recchia's vehicle there for her. Brewster's brother did not take Brewster and child home. Instead, they went to their grandmother's house, where Brewster's brother lived. Brewster refused to take Recchia's telephone calls, and she sent him a text complaining about him keeping child out rather than going home, for "blow[ing] sh*t up [his] nose" and leaving her with nothing, and for his self-centered behavior. Recchia threatened to move out. After her shift, she picked up Brewster and child and they went home.

Brewster testified at trial that he had been in a relationship with Recchia for about two years, was the only father child had ever known, and that soon after they began dating, she and child moved in with Brewster and his father (Roy Brewster), and Recchia and child continued to live with Roy even while Brewster was in jail for a DUI (from February 2020 to July 11, 2021). According to Brewster, during this time Recchia's use of cocaine and heroin increased, he suspected she was stealing money and items from Roy to fund her drug habit, and they were having problems in their relationship.

Brewster recounted that shortly after he was released from jail, Roy was diagnosed with lung cancer and placed on oxygen. Brewster returned home one day to find that Roy had a cut over his eye, the oxygen machine was beeping, and the nozzle was broken off the tank. Roy was acting oddly. Brewster repaired the tank. A medical professional mentioned oxygen deprivation and advised Brewster that if Roy worsened, Brewster should take Roy to the hospital. Roy was later hospitalized, released to in-home Hospice care, and died the next day.

Brewster reported that after Roy died, his relationship with Recchia deteriorated. He became suspicious Recchia or her associates were responsible for Roy's death, and when he would not fund her drug habit, she became physically violent with him and items of value started disappearing from his property. Brewster explained that eventually he asked Recchia to leave, but she kept returning.

Brewster stated that he planned to move to Florida and was trying to sell his house, farming items and personal property. Brewster reported that Recchia became increasingly erratic, and on October 17, 2021, she ended up leaving him and child on the side of the road in Ohio and he and child had to spend the night at a motel.

Brewster testified that on the evening of October 18, the night before the murder, Recchia went to work at the club while he watched child, and then requested that he get drugs from her dealer and drop them off at the club, which he did. Brewster reported that he and child went to Brewster's grandmother's house and hung out there with Brewster's brother and children. Brewster stated that Recchia called him several times at around 11:30 p.m., upset that they were not home, and at around 3:45 a.m. the next day she got off work and said she was coming to pick them up. When she arrived, he told her that he would stay there and she should take child, but Recchia asked him to go with her to get some heroin. Brewster agreed on the condition that she would then take him back to his grandmother's house.

Brewster reported that after Recchia bought the drugs, she would not take him back to his grandmother's house, forcing him to jump out of the car at a red light. He testified he had to jump on the hood of her car to avoid being run over by her.

Brewster explained that after he got back to his grandmother's home, Recchia called him forty-five times, and he finally answered at 11:23 a.m. on

8

October 19. Brewster told Recchia that he probably would not be coming home that day.

According to Brewster, Recchia offered to get his dad's jewelry back (this was among the items which had disappeared from his home), so Brewster agreed to have her pick him up. They drove to Ohio, and she said she would get the jewelry back from a relative's house. Brewster explained he was suspicious because she took him to a bad part of town. They stopped, she walked to a house, came back, and said no one answered the door. Brewster testified he believed it was all a ruse to get him into her car.

Brewster got Recchia to take him back to his house because someone wanted to buy his trailer. She dropped him and child off and left for a few hours. She returned at about 8 p.m. when the man arrived to buy the trailer.

Brewster stated that he put child to bed while Recchia did lines of cocaine in the bathroom. He got Recchia to let him use the bathroom and locked the door. While he was inside, she beat on the door.

Recchia asked him for money from the sale of the house. He explained he had previously promised to give her money for a fresh start when he moved to Florida. He reasoned that she must have believed he had already sold the house and he was holding out on her. He recounted that he explained that he did not have the money yet, but Recchia did not believe him.

Brewster stated that Recchia started punching at him and he shoved her back. Recchia told him that if he kept "playing," she would have someone collect the money from him. He took this statement as a threat because some

9

of his property was already missing, and she had told him people had already been there to take his stuff.

Brewster recounted that Recchia commented something like "Why couldn't you be on oxygen just like your [curse word] dad" which he took as confirmation of his suspicion that she had tampered with Roy's oxygen tank. Recchia repeated that he had better give her money or someone would come and get it.

In response, Brewster went to his bedroom closet and grabbed a rifle. He sat in a living room recliner and asked Recchia who had been on his property stealing things. She asked what he thought he would do with the rifle as it was not loaded. He checked and she was correct, but it had been loaded the last time he had seen it.

Brewster explained he went to his dad's room and saw objects from his dad's closet on the mattress that were not there when he left. He decided he needed to take what Recchia said seriously. He asked her who had been in her house, and she started swinging at him. Brewster testified he shoved her aside and ran to the living room. He grabbed ammunition for the rifle. He ran to the kitchen, and she followed him. According to Brewster, Recchia told him that she needed to get the money tonight or he was going to die that night. He begged her to tell him if someone else was in the house and she told him that he would give her the money or find out.

Brewster testified Recchia began smacking the kitchen cabinets, yelling "Kill this [curse word]" over and over. When he asked if someone was there or

10

not, she repeated, "Kill this [curse word]." Brewster interpreted Recchia's words as her directing someone else to kill him.

Brewster explained that when Recchia turned around, he shot her. He then went to check on child as he was afraid someone was in the house. He heard a loud bang, ran back in the kitchen, and fired another shot.

Brewster testified that he then took child, Recchia's keys, her phone which had GPS, and her vehicle and left. Brewster explained he took child to protect him from anyone on the property. After traveling to Detroit, he decided to go back home and take child to Recchia's father. He testified he planned to call the police after they were safe.

Brewster testified that while he was driving home, he was tired and falling asleep at the wheel, and then the police tried to pull him over, he did not want to pull over because he wanted to spend more time with child. Brewster admitted he did not tell the complete truth in his interview but blamed this on being exhausted and scared.

An analysis of Recchia's blood revealed it contained a high level of cocaine; it also contained THC, and metabolites of both drugs. Her urine contained Gabapentin and a metabolite of fentanyl, with the medical examiner opining that Recchia probably ingested fentanyl the day before her death.

Brewster was indicted for murder (domestic violence), kidnapping of child, possession of a firearm by a convicted felon, and being a PFO-1.

At trial, Brewster tendered a self-protection instruction which the trial court denied. The trial court instructed the jury on murder (intentional or

11

wanton) and the lesser included offenses of first-degree and second-degree manslaughter, kidnapping with the lesser included offense of second-degree unlawful imprisonment, and possession of a firearm by a convicted felon. The jury convicted Brewster of murder, kidnapping, possession of a firearm by a convicted felon, and PFO-1. The jury recommended a life sentence for murder, ten years enhanced to twenty years for kidnapping, and five years enhanced to twenty years for possession of a firearm by a convicted felon, with all convictions to run concurrently. The trial court sentenced Brewster in accordance with these recommendations.

## II. ISSUES

### A. Did the Trial Court Err by Refusing to Instruct the Jury on the Defense of Self-Protection?—Preserved

Brewster tendered proposed jury instructions for murder and the lesser included offenses which included the defense of self-protection and the defense of imperfect self-protection. Brewster argued at trial that he was entitled to these instructions based on his testimony that he was afraid of Recchia before he shot her because: (1) he believed she killed his father; (2) she had physically attacked him earlier by punching him; (3) she told him he needed to give her money or someone was coming to get it; (4) his previously loaded rifle was unloaded; (5) his father's belongings had been pulled out of his closet with the air-conditioning unit removed from the window; (6) she told him to get her money or he was going to die that night; (7) she would not answer his question as to whether there was someone else in the house and told him that he was going to find out if he did not give her the money; (8) there were knives in the

12

kitchen; and (9) she smacked the cabinets and yelled "Kill this [curse word]" and he believed there was someone on the property trying to steal from him, that person had a gun, and she was trying to summon that person. He argued he was also entitled to an instruction on imperfect self-protection, because he had a mistaken belief that Recchia was calling for a third party to kill him.

The trial court denied Brewster's requests on the basis that he could not have an objective belief that he needed to protect himself from the imminent use of physical force by Recchia.

We review the trial court's decision not to instruct on self-protection or imperfect self-protection for abuse of discretion. *Kentucky Guardianship Administrators, LLC v. Baptist Healthcare System, Inc.*, 635 S.W.3d 14, 20 (Ky. 2021).

"(1) A person is guilty of murder when: (a) With intent to cause the death of another person, he causes the death of such person or of a third person[,]" KRS 507.020[,] and he is not justified by self-protection pursuant to KRS 503.050.

KRS 503.050 provides in relevant part:

(1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force *by the other person.*

(2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.

13

(Emphasis added).

There must be sufficient evidence in the record to justify a self-protection instruction:

> The criterion is whether movant, in good faith, believed it was necessary to exercise extreme force in saving his own life. It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper. We have held that before such qualifying instructions are proper there must of course be evidence to justify it.

*Sutton v. Commonwealth*, 627 S.W.3d 836, 853 (Ky. 2021) (quoting *Downs v. Commonwealth*, 620 S.W.3d 604, 614 (Ky. 2020)).

Brewster did not provide *any* evidence that the use of physical force was necessary against Recchia to "protect himself against the use or imminent use of unlawful physical force by the other person[,]" under KRS 503.050(1). Shooting Recchia could only be justified if he had to protect himself against force *from her*. Brewster also could not establish that Recchia's actions justified his use of deadly physical force upon her because "the defendant believes that such force is necessary to protect himself against death [or] serious physical injury[,]" under KRS 503.050(2). Even if the jury were to believe the entirety of Brewster's testimony that the unarmed and erratic Recchia was summoning someone else to kill him, none of Recchia's actions or Brewster's statements

14

indicated that Brewster's subjective fear could justify his use of deadly force against Recchia.[2]

Brewster is also not eligible for an imperfect self-protection instruction under KRS 503.120(1), because even if the facts were as he believed them to be, he would not be merely wanton or reckless in his belief that he needed to use force against Recchia, but unreasonable in such a belief. *Gribbins v. Commonwealth*, 483 S.W.3d 370, 374 (Ky. 2016). Such an instruction is thereby unwarranted. Recchia herself posed absolutely no threat to Brewster according to his own testimony and it was unreasonable for him to believe otherwise when the only vague threat she possibly posed was that she could summon someone else to harm him.

Accordingly, the trial court did not abuse its discretion in refusing to instruct the jury on self-protection or imperfect self-protection.

## B. Did the Trial Court Err by Excluding Testimony from the Defense Expert about the Likely Effects of the Cocaine found in Recchia's Blood on her Behavior?—Preserved

On January 5, 2023, Brewster filed a notice of his intent to call Dr. E. Don Nelson as an expert witness to testify to the presence of drugs in Recchia's blood at the time of her death and submitted lengthy filings regarding his expertise. On January 27, 2023, Brewster filed a notice clarifying that "he submits on the issue of whether an expert can testify as to behavioral intent

---

[2] *See Sutton*, 627 S.W.3d at 854.

based solely on drug content." In response, the Commonwealth requested a *Daubert*[3] hearing which by the consent of the parties was held via Zoom.

At the *Daubert* hearing, Dr. Nelson testified extensively as to his qualifications. There was no real issue as to whether he was a qualified expert; rather, the issue was whether he could testify regarding the behavior Recchia would have exhibited based on her level of cocaine intoxication. Dr. Nelson explained that when using cocaine an individual becomes grandiose, energetic, and omniscient. She may also be aggressive and hostile when confronted.

Dr. Nelson stated that he did not entirely agree with the American Academy of Forensic Scientist Standards (AAFSS) 5.3(b), "A toxicologist should not address behavioral intent based solely upon a drug concentration[,]" and 5.3(c), "A toxicologist should not opine as to a specific individual's degree of impairment based solely on a quantitative result." He instead stated that this depended on the facts of the case as some drugs' effects are predictable, and in this case the effects were predictable based on the high level of cocaine found in Recchia's blood.

Dr. Nelson explained he planned to testify as to how cocaine hydrolyzes, and the symptoms caused by toxic levels of cocaine, meaning the physical and psychological effects of cocaine, not specific behaviors or physical or psychological action taken. Dr. Nelson stated he could not render an opinion with 100% certainty that Recchia was, for example paranoid or felt bulletproof,

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 582 (1993).

and while he could describe the effects of her level of cocaine intoxication, he could not put a percent of certainty on Recchia experiencing that effect being reflected in her behavior prior to her death.

The Commonwealth's expert, Dr. Gregory James Davis, testified during the *Daubert* hearing that toxicologists could not testify as to what a person's behavior was solely based on the presence and quantity of a drug. Dr. Davis opined that toxicologists had to follow the AAFSS 5.3(b) and (c) and an expert could not testify to what a person's behavior was solely based on the presence and quantity of a drug. While Dr. Davis agreed on cross-examination that there were specific symptoms associated with cocaine use, like paranoia, depression, agitation, and feeling invulnerable, he concluded it was impossible to take a level of cocaine and extrapolate the person's behavior, as behaviors depended upon the individual.

The trial court did not immediately make a ruling as to whether Dr. Nelson could testify as to Recchia's likely behaviors based on her level of cocaine intoxication, explaining that whether the testimony would be allowed would depend upon if there was evidence at trial regarding Recchia's behavior which could make Dr. Nelson's proposed testimony relevant.

At trial, the medical examiner testified to the results of Recchia's blood test and that the level of cocaine in her blood was high enough as to cause an overdose.

After Brewster testified about Recchia's behavior and her behaviors were associated with cocaine intoxication, he proposed that an appropriate basis

17

had been established to allow Dr. Nelson's testimony about how Recchia's cocaine intoxication could have caused such behaviors. However, the trial court ultimately ruled that it would not allow such testimony by Dr. Nelson. Brewster did not call Dr. Nelson to testify (given that he would not be permitted to give such opinions).

We review the trial court's evidentiary ruling excluding this category of opinion evidence for abuse of discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000).

Brewster argues the trial court erred by failing to admit Dr. Nelson's testimony under *Daubert*, and such testimony was essential to corroborate Brewster's account of Recchia's behaviors which supported his belief, or even mistaken belief, that he needed to protect himself from her and others and denying him the admission of such evidence violated his right to present a defense.

Brewster fails to provide any authority requiring admission of evidence as to the possible effects that cocaine intoxication had on Recchia and instead presents authority generally justifying the admission of expert testimony regarding establishing intoxication (a matter not in dispute). However, Dr. Nelson's speculative testimony that Recchia's cocaine intoxication could cause the same kinds of behaviors which Brewster testified Recchia exhibited, was irrelevant. Therefore, the exclusion of such evidence was proper.

18

## C. Did the Trial Court Err by Allowing the Commonwealth to Use Brewster's Post-Arrest, Post-*Miranda* Silence to Questions Never Asked Against Him?—Preserved

Brewster's attorney in his opening statement, explained that Brewster would assert a self-protection defense, justifying Brewster's panic to explain why he fired the gun and fled with child. The statement included the comments that "[t]hings keep escalating," Brewster believed he had to fend off "an imminent attack[,]" he was concerned that someone was in the house, had been in the house, or would be coming back, and when he fled with child, "he was trying to save [child] from the impending danger that was looming[,]" and was acting to remove child from "what he believed was an extremely dangerous situation."

When Brewster was stopped for erratic driving and arrested, Brewster did not assert his *Miranda* rights and instead cooperated with the OHSP in answering all questions asked of him. Sargent Johnson questioned him at the scene of the stop, Trooper Devers also apparently spoke to him at the scene, and Trooper Roe asked him a couple of questions at the OSHP post. These conversations, accordingly, came after he was advised of and waived his right to silence. Brewster did not file any motion to suppress his statements to the OSHP.

Sargent Johnson's questions focused on why Brewster had child and Recchia's vehicle, whether he had permission to take the vehicle and child, how to reach child's mother, and from where he was going or coming. Brewster answered some questions in a deceptive manner which implied that Recchia

19

was alive as he stated that she knew he had child with him, had allowed him to borrow her vehicle, he believed she was home and provided a phone number for her.

While examining OHSP officers, the prosecutor asked them as series of questions relating to Brewster's defense. Trooper Roe was the first officer to be asked such questions. Upon hearing the first such question, whether Brewster ever told him that "he was fending off an imminent attack," Brewster objected to this question and this general line of questioning as being improper comments on his right to remain silent and violating his constitutional rights under the Fifth Amendment. The trial court denied his objection and allowed such questions.

Accordingly, the prosecutor was allowed to ask whether Brewster told Trooper Roe, Sargent Johnson, and Trooper Devers, that "he was fending off an imminent attack[,]" "was concerned there was someone in his house[,]" "his panic was at a peak[,]" "he was trying to save a three-year-old little boy from impending danger that was looming[,]" and "he was running for his life." The officers answered "no" to all of these questions.

The day after this testimony, Brewster asked the trial court for a mistrial, and barring that, an admonition that the jury was not to consider what Brewster did not say to the OSHP officers, on the basis that these questions were an impermissible comment on Brewster's right to remain silent. He cited *Doyle v. Ohio*, 426 U.S. 610 (1976) and *Bartley v. Commonwealth*, 445 S.W.3d 1 (Ky. 2014). The trial court denied the motion, reasoning that the defense had

20

"opened the door" based on its opening statement, and Brewster had cooperated in responding to the officers' questions after being given *Miranda* warnings and had not exercised his right to remain silent. The trial court also allowed the prosecution to ask Brewster similar questions during its cross-examination, over the defense's objection.

On appeal, Brewster argues that it was impermissible for the prosecution to comment on his post-*Miranda* silence for impeachment purposes, stating that it was inappropriate for the Commonwealth to inquire of the three OSHP officers about Brewster's silence to questions the officers never asked him, and his failure to volunteer such information. He argues that answering the questions of the OSHP regarding the crimes of fleeing and evading police with a young child did not provide a basis for him to claim self-defense regarding killing Recchia.

It is well established that a defendant's choice to remain silent during a custodial interrogation and to not take the stand and testify cannot be used against a defendant by the Commonwealth to establish guilt. *Miranda*, 384 U.S. at 479. If, after *Miranda* warnings are given, a defendant exercises the right to remain silent, *Doyle*, 426 U.S. at 619, holds that such silence cannot be used against the defendant as evidence of guilt. This is because total silence after *Miranda* warnings is "insolubly ambiguous" and could simply reflect the defendant's decision to exercise these *Miranda* rights, and the concurrent assurance that such silence would not be used against the defendant. *Doyle*, 426 U.S. at 617-18. Similarly, we have held in Kentucky that selective silence

21

after being given *Miranda* warnings, that is, refusing to answer certain questions, or questions about certain topics, cannot be used as evidence of guilt. *Bartley*, 445 S.W.3d at 11-12.

*Miranda* prevents even "statements merely intended to be exculpatory by the defendant" from being admitted if the defendant was in custody when questioned and prior *Miranda* warnings and an effective waiver were not obtained, because even "exculpatory" statements "are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication." 384 U.S. at 477.

However, it is appropriate for the Commonwealth to inquire into a defendant's prior inconsistent statements when the defendant chose not to remain silent after *Miranda* warnings and *Doyle* does not bar use of such voluntary statements. *Anderson v. Charles*, 447 U.S. 404, 408-09 (1980) (per curium). *See Moss v. Commonwealth*, 531 S.W.3d 479, 487-88 (Ky. 2017), and *Taylor v. Commonwealth*, 276 S.W.3d 800, 808-09 (Ky. 2008). "A statement may be contradictory because of what it leaves out as well as what it says" and "cross-examination bringing out the difference between the two statements should be classified as impeachment, not comment on the accused's right to remain silent." *Wade v. Commonwealth*, 724 S.W.2d 207, 208-09 (Ky. 1986).

Therefore, it did not impinge on Brewster's right to silence for the prosecutor to ask about Brewster's responses to questions which implied that Recchia was alive. Such impeachment based on his prior inconsistent statements was certainly fair game. However, Brewster does not argue

22

otherwise, instead he disputes that the officers and he could be fairly asked about matters which he was never, even peripherally, asked about.

The questions to which Brewster objected constituted extreme gamesmanship by the prosecuting attorney. They were leading questions that were inappropriate for direct examination and were about topics that Brewster was never asked about and could not have been asked about because the OSHP officers did not know anything about Recchia's murder. The scope of these questions was clearly improper.

Additionally, Trooper Roe, Sargent Johnson, and Trooper Dever were asked these questions *before* they ever testified about how they questioned Brewster after he was *Mirandized.* While Sargent Johnson subsequently testified about giving Brewster *Miranda* warnings and questioning him, Trooper Roe testified only as to two questions he asked Brewster. It is unclear whether Trooper Dever questioned Brewster at all, as Trooper Dever only testified that they "interacted briefly." It is unclear whether Trooper Roe or Trooper Dever ever asked Brewster anything that would even arguably call for a response which would have anything to do with Recchia's current condition or why he left his home with child.

While Brewster argued these questions were objectionable as violating his right to silence and using his silence against him as prohibited by *Doyle,* this was not an artful explanation of the actual problems with these specific questions. Nevertheless, these questions were clearly improper. The trial court should not have allowed these questions to be asked, or once the scope of the

23

problem was revealed, should have admonished the jury not to read guilt into Brewster's failure to volunteer information unrelated to the traffic stop and the questions he was being asked. Error did occur, but it was harmless given Brewster's admission that he killed Recchia and his failure to establish a sufficient basis for a self-protection instruction.

## D. Did the Trial Court Err in Not Excluding Photos from the Crime Scene and Autopsy?—Preserved

Brewster objected to the admission of certain photographs as being repetitive of other gruesome photographs. Specifically, he objected to CW 75-77 (of Recchia's body at the crime scene), and CW 109-115 (of Recchia's body at the autopsy) as being too repetitive and argued that not all of these photographs needed to be admitted. The defense and the Commonwealth engaged in extensive argument regarding each of these photos, the Commonwealth argued that it had already eliminated repetitive photos, the trial court asked specific questions of how certain photographs differed in what they depicted, and the trial court made individual determinations to admit each of these photographs based on how they differed from other photographs in what they showed.

The balancing test contained in Kentucky Rules of Evidence (KRE) 403 was satisfied because the trial court did not abuse its discretion by admitting these materials as more probative than prejudicial. *See Hall v. Commonwealth*, 468 S.W.3d 814, 823-28 (Ky. 2015) (*Hall I*) (which provides a wealth of analysis); *see also Hall v. Commonwealth*, 645 S.W.3d 383, 400-02 (Ky. 2022) (*Hall II*); *Easterling v. Commonwealth*, 580 S.W.3d 496, 509 (Ky. 2019); *Rucker*

24

*v. Commonwealth*, 521 S.W.3d 562, 572-73 (Ky. 2017); *Ragland v. Commonwealth*, 476 S.W.3d 236, 248-49 (Ky. 2015). An important point is that if the materials are not truly gruesome, the probative value of the materials does not need to be as high for admission because the risk of undue prejudice is low. *See Hall II*, 645 S.W.3d at 400-02; *Ragland*, 476 S.W. 3d at 249.

The trial court properly followed the requirements set out in *Hall I* by considering each photograph individually, and in comparison with one another, considering their relative probative value to the case the Commonwealth had to prove. 468 S.W.3d at 827. While it was undisputed that Brewster killed Recchia, how this occurred and the manner in which she was shot were relevant to determining the validity of his defense and whether he committed murder or a lesser included offense.

We have reviewed these photos and can confirm that they each differed in what they showed regarding Recchia's injuries and the scene. Regarding CW 75-77, these were the only photos which depicted Recchia's body at the scene. Each photo showed different things: CW 75 depicted her body in the context of the scene, CW 76 showed her body in relationship to marked items from a different view, and CW 77 also showed other parts of the scene that were missing from the two prior photographs, specifically the detail of blood splatter.

The photos from the autopsy, CW 109-CW 115, showed how Recchia's body was received (CW 109), how her wounds appeared when the blood was removed from her face (CW 110), close-ups of each of the entry points of the bullets, with one photo of each (CW 111 and 112), the path of the bullets as

25

shown with dowels with one photo of one trajectory (CW 113) and another showing both trajectories from a different angle (CW 114), and an exit wound (CW 115). These photos were not particularly gruesome given that the entry and exit wounds were small and the surrounding skin had been cleansed of blood.

In prior criminal appeals, our Court has viewed and affirmed the admittance of other photographs which were far more gruesome than those admitted in this case where they were relevant and more probative than prejudicial. *See, e.g., Capstraw v. Commonwealth*, 641 S.W.3d 148, 153-56 (Ky. 2022); *Ross v. Commonwealth*, 455 S.W.3d 899, 910–11 (Ky. 2015); *Quarels v. Commonwealth*, 142 S.W.3d 73, 85 (Ky. 2004). While the crime scene photos depicting the victim were gory, they did not thereby become inadmissible. *Barnett v. Commonwealth*, 979 S.W.2d 98, 102 (Ky. 1998). Additionally, there were only three such photographs and they accurately depicted the condition of Recchia's body when it was discovered. Accordingly, there was no error in these photographs being admitted.

### E. Did the Trial Court Err in Instructing the Jury on Kidnapping in such a Manner as to Deny Brewster a Unanimous Verdict?

Regarding the kidnapping of child, Brewster was indicted under all six subsections of KRS 509.040(1), which provides as follows:

> A person is guilty of kidnapping when he unlawfully restrains another person and when his intent is:
>
> (a) To hold him for ransom or reward; or
>
> (b) To accomplish or to advance the commission of a felony; or

26

(c) To inflict bodily injury or to terrorize the victim or another; or

(d) To interfere with the performance of a governmental or political function; or

(e) To use him as a shield or hostage; or

(f) To deprive the parents or guardian of the custody of a minor, when the person taking the minor is not a person exercising custodial control or supervision of the minor as the term "person exercising custodial control or supervision" is defined in KRS 600.020.

On April 5, 2023, Brewster submitted a request for a bill of particulars, specifically objecting to the kidnapping charges which did not specify under which subsection of intent the Commonwealth was proceeding. The Commonwealth responded that same day and objected to the defense attempting to force the Commonwealth to pick under which subsection it was proceeding.

Before the trial, the Commonwealth agreed that KRS 509.040(1)(d) did not apply. However, the trial court denied Brewster's request that the Commonwealth be forced to commit to one of the alternative elements pre-trial, explaining that the instructions would conform to the evidence at trial.

Brewster's proposed jury instructions for kidnapping listed the five possible grounds for Brewster's needed intent. Each ground was in brackets and an included footnote indicated: "Defense Counsel reserves the right to edit this instruction once it knows which prong of the kidnapping charge the Commonwealth is proceeding under."

The evening before the close of evidence, the trial court presented the parties with a draft of the kidnapping instruction which included most of the

27

alternative elements for specific intent. Brewster objected that this would present an unanimity issue. The trial court asked the Commonwealth which alternatives it wanted included and the Commonwealth requested KRS 509.040(1)(b) (accomplishing or advancing the commission of a felony); (c) (terrorizing child or another); and (f) (depriving the parents of guardian or custody of child).

Brewster requested a directed verdict on the kidnapping charge at the close of the Commonwealth's case and at the close of all evidence, arguing there was no proof as to his intent on either of these three grounds as he was planning to return child to Recchia's father, was trying to keep child safe and not intending to terrorize him, and the felony had already been committed before he took child. The trial court denied these motions.

The jury instructions submitted to the jury on kidnapping provided that Brewster restrained child without consent and in doing so his intent was to hold child for one of three purposes:

1. to accomplish or advance the commission of a felony,

OR,

2. to terrorize [child] or another,

OR,

3. to deprive the parents or guardian of the custody of [child], and defendant was not a person exercising custodial control or supervision of [child] as defined in instruction No. 4.

Under the definitions provided in Instruction No. 4, "Person Exercising Custodial Control or Supervision" was defined as "a person or agency that has

28

assumed the role and responsibility of a parent or guardian for a child, but that does not necessarily have legal custody of the child."

Brewster argues that because there was insufficient evidence to find he had the intent to satisfy all three alternative intents, he was deprived of a unanimous verdict. Brewster argues that while the Commonwealth could have proven that his taking of child helped him accomplish a felony, because if he had dropped child off sooner, Recchia's body would have been discovered sooner, he was in fact acting as a person exercising custody and control of child as he often took care of him and was his "father figure." He also argues there is no proof that he intended to terrorize child or anyone, pointing to the fact that child was fine when discovered in the vehicle by the troopers.

This kidnapping instruction constituted a combination instruction, which permits a conviction of the same offense under multiple alternative theories. This does not deprive a defendant of the right to a unanimous verdict so long as there is evidence to support a conviction under each of the presented theories beyond a reasonable doubt. *Commonwealth v. Roark*, 686 S.W.3d 124, 131 (Ky. 2024); *Brown v. Commonwealth*, 553 S.W.3d 826, 839 (Ky. 2018). Combined instructions regarding mental states do not create an unanimity error so long each mental state can be inferred from the evidence. *Cox v. Commonwealth*, 553 S.W.3d 808, 813-14 (Ky. 2018).

The jury could properly infer that child was taken with Brewster having any or all of the prohibited intents. Therefore, there is no unanimity error. While Brewster now argues that he could not have the *intent* to terrorize child

or another because that *result* did not occur (child was not terrorized and Recchia's parents could not be terrorized because they did not know child was missing until the police informed them that he was found), his intent is not negated by his actions not having that specific result. Similarly, while Brewster argues he did not have the intent to deprive anyone of custody over child and was instead himself a person exercising custodial control or supervision over child, a contrary intent could properly be inferred by his actions. Any right Brewster had to child was permissive based on Recchia's consent, which was unavailable after her death. Brewster does not argue he was child's biological father or that he was a *de facto* custodian of child (nor would the evidence presented have supported either theory). While the jury could have perhaps believed Brewster did not intend to terrorize anyone and was a person acting as child's parent, the jury was not required to come to such a conclusion. Therefore, there was no unanimity error caused by this combination instruction as there was sufficient evidence for the jury to infer beyond a reasonable doubt that when Brewster took child, he intended to delay the discovery of a felony (murder), terrorize child or another, and to deprive child's new guardians of custody.

### III. CONCLUSION

The Kenton Circuit Court did not err in its trial rulings. Therefore, we affirm Brewster's convictions and sentences.

All sitting. All concur.

30

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

James Havey
Assistant Solicitor General